**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**MELISSA KAYE JAMISON,**

      **Plaintiff,**

**vs.**                              **Case No. 4:08cv536-SPM/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

Plaintiff, Melissa Kaye Jamison, applied for supplemental security income benefits. Plaintiff was 44 years old at the time of the administrative hearing (on November 5, 2007), has a 12th grade education, and has past relevant work as a laundry worker, as a housekeeper, and a fast food worker. Plaintiff alleges disability

due to schizophrenia.  The Administrative Law Judge found that Plaintiff had "severe"

impairments of schizophrenia (undifferentiated), cocaine abuse, and hypothyroidism.  R.

22.  He determined that Plaintiff had the residual functional capacity to perform unskilled

work requiring a medium level of exertion.  R. 27.  He found that Plaintiff was not

impaired mentally if she complied with her psychotropic medications and did not use

crack cocaine.  R. 27.  He further determined that Plaintiff could not return to her past

relevant work, but could do other work in the national economy and was not disabled.

R. 29.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. <u>Barnhart v. Walton</u>, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

Plaintiff testified at the hearing on November 5, 2007, that she was enrolled in six hours (two classes) at Tallahassee Community College, but it was "paced study." R.

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link). Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html. The pages at these websites are not attached to this report and recommendation because the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

972. The courses were business math and college reading. *Id*. She said she had started in August, 2007. *Id*.

Plaintiff lived with her mother and niece. R. 973. Plaintiff said that sometimes she did "temporary work" as a day laborer, but not part-time work. R. 973-974. The work "could be anything from housekeeping" to day labor. R. 974. She said she seldom worked. *Id*. Her last work had been about a month earlier for 6 hours doing housekeeping. *Id*.

Plaintiff had been in prison three times. R. 975. In prison, she worked in the laundry for three years and did dormitory cleaning. R. 976. She had also been in the military. R. 977. She worked a postal job, too, with the last date of work October 16, 1986. R. 977-978. She also had done temporary fast food work. R. 978. Her only full time work in recent years were the jobs in prison. *Id*.

Plaintiff admitted that she had used to use drugs. R. 990. She said she does not use drugs anymore. R. 991. She used crack cocaine. *Id*. She then said that the last time she used drugs was a week or two earlier. *Id*. She said she does not go out and get or buy drugs, but her boyfriend uses drugs and shared drugs with her. *Id*. Crack cocaine is all that she uses. R. 992. She said that crack cocaine "passed through many places where I lived and it's not easy avoiding it." *Id*.

Plaintiff testified that she had been diagnosed with schizophrenia and was on medication. R. 978-979. She said:

> Is I cannot work because I cannot work around people because I get nervous, really. Then I think about, you know, what I have to do to keep myself from, you know, breaking, breaking, breaking down, you know. Keep myself from, really, keep myself under control, under control, really.

You know, because what people say to you, because most of the places
where I work at, people know me from my –

R. 979.  In response to a question from the ALJ, she said that she would try to perform

the job of "sorting clothes:"

Unless people are telling me what I do, I know what my limitations is, the
doctor told me that I can't not do, then I'm not going to do it so I'm just
sitting up on somebody's job just looking and staring all day.  That's why I
do temporary work because it's my choice if I go to work or not.  I'm not
demanded to work.

R. 980.  She said that if she had to work for a day sorting clothes, or cleaning offices at

night, she could do it.  *Id.*  She said she would try to do such work if she did not start

felling schizophrenic or afraid.  *Id.*

Plaintiff's testimony as to her living arrangement with her mother was confused.

The following colloquy took place:

Q      But she doesn't expect you to pay her [room and board?

A      Pay her $400, no, sir.

Q      And for your other expenses, she's also providing for that?

A      Yes.  Transportation and yes, any other thing that I need,
yes.  Uh-huh.  Light bill, yeah, but I pay for food.

Q      Okay.  And your mother doesn't expect you to repay her
back?

A      No.  But she do require me to live with her and to be
guardian and to pay her a monthly amount.  As far as, you
know, rent a month and yes, I do have to pay her rent.

Q      Are you paying her any rent?

A      No, because I'm unemployed.  The only thing I can give her
is food stamps right now as that's the only thing that, income
that I have.

R. 981.

When asked if Plaintiff had any other impairment, other than schizophrenia, she

said:

> Yes.  Right now, I have a thyroid, overactive thyroid and it cause a lot of,
> you know, it cause me to have to be absent from doing a lot because
> when I take the medication, it instantly, you know, I have to go and get rid
> of excessive waste until they get it to a point where it is hypo, still hyper
> and I'm going through treatment.  Went through a treatment.  I don't know
> if I have to go for another one but the [inaudible] so I try not to do too
> much of high pressure work therapy because that's another --

R. 982.

Plaintiff said that she could stand for a couple of hours at a time as long as she

could move around, because her medications cause cramps.  R. 985-986.  She said

she could not sit for a long period, but walked a lot; she walked "all day," and she rode

the bus.  R. 986.

Plaintiff said that she took two classes, 45 minutes to an hour each, twice a

week.  R. 987.  On those two days (Tuesdays and Thursdays), she was on campus

from about 7:30 a.m. to 7:00 p.m.  *Id.*  She said she went to the library to study.  *Id.*

When asked whether she spent a lot of time in the library, Plaintiff said "I spend a lot of

time in the community, uh-huh, yes."  R. 988.  When asked if she spent a lot of time

during the day sitting in class, she said:

> No really.  I do a lot of walking, really.  Just kind of like, kind of participate
> in any kind of thing that keep me motivated until I can get back home, yes.
> It don't matter what I do.

R. 988.  She said she associated with classmates, but "not a lot;" she also associated

with her teachers and with coworkers in the temporary labor force.  *Id.*  She said she

loved to exercise and walked daily. R. 989. When asked how many hours a day she walked, Plaintiff said:

> I got to say about, I'm talking about 7:30 to 7:00 at night. I'm talking about doing what I just, well, that's about 15, seven, that's 12 hours there. I'm talking about 12 hours a day.

R. 989. She then said she walked 8 hours of those 12 hours. *Id.* She said that on campus, when she was sitting in the library, she was "resting." R. 990.

**Medical evidence**

As noted by Plaintiff, doc. 18, p. 2, Plaintiff has a lengthy history of treatment for schizophrenia at the Apalachee Center for Human Services, and a lengthy history of noncompliance with prescribed medications. As noted in a medical note taken on January 13, 1997, she was first diagnosed with schizophrenia in 1986. R. 211. She had been in Florida State Hospital in 1988 and in 1989 for about 5 months, and in PATH (a local short term inpatient mental health care facility) for a few days in 1991. R. 212. She had been in and out of correctional institutions for about ten years prior to January 13, 1997. *Id.* She said that a maternal uncle took Mellaril and Prolixin, a paternal uncle was then receiving psychiatric treatment from the Apalachee Center. *Id.* Plaintiff said she had been sexually abused when she was young extending into adulthood. *Id.* She was then taking Mellaril. *Id.* Plaintiff served honorably in the military (Army) from 1980 through 1984. R. 213. She started using crack cocaine in 1987. *Id.* She claimed she had not used crack cocaine since 1993. *Id.* Plaintiff denied having hallucinations or delusions at that time. *Id.* She was alert, oriented, and her mood was neutral. *Id.*

On January 15, 1990, Plaintiff was given a "dual diagnosis." She was diagnosed with schizophrenia separate from her crack cocaine addiction. R. 243. It was noted

that while she was at Florida State Hospital, she was completely off crack but the symptoms of schizophrenia continued. *Id.* She responded to neuroleptics. *Id.* "Therefore she carries both diagnoses of cocaine intoxication and delusional disorder and paranoid schizophrenia, in remission. Her basic problem however is her noncompliance due to her own indifference." R. 244.

On March 26, 1992, she was seen at the Apalachee Center for Human Services on an emergency basis. R. 225. She had been noncompliant with her prescribed medications, probably was continuing to use drugs, and was presently psychotic. *Id.*

Plaintiff was found to be not compliant with her medications on May 15, 1997. R. 216. The interviewer wrote: "She [adamantly] refuses to take the pill or any other medication. Because of the client's paranoia and thought disorder I do not think she will be able to focus in a job situation until she is more stable." R. 216. The interviewer concluded that the case manager should talk with Plaintiff's mother and have her involuntarily committed for treatment[2] if she became aggressive, and said: "I see no reason to see her more frequently because she will not cooperate with adjustment of medication." *Id.*

On April 7, 1999, Plaintiff was seen at the Center with the diagnosis of schizophrenia paranoid, chronic type, and a history of cocaine dependency, currently in remission. R. 209. She had just been released from prison. *Id.* She said she was attending classes at Tallahassee Community College in the mornings, five days a week, taking math, English, and business. *Id.* She denied use of cocaine since being in

---

[2] Civil involuntary commitment for treatment for mental illness in Florida is governed by the procedures of FLA. STAT. § 394.463, commonly known as the Baker Act.

prison, and was in prison for 35 months. *Id.* It was noted that Plaintiff was "very

suspicious about medication over the last two years" and only wanted to take liquid

Mellaril. *Id.* Plaintiff was guarded and suspicious, and her speech was often tangential.

*Id.* A GAF of 50 was assigned.[3]

On February 7, 2000, Plaintiff was seen again at the Apalachee Center. R. 550.

She was again noncompliant with medication, and had not been seen since July 26,

1999. She said she was enrolled at Tallahassee Community College, but the Staff

Psychiatrist, Angela Escueta, M.D., said:

> She insists that she is not flunking in school. . . . I am not sure if this client
> can focus in her school work. She is hyperverbal and argumentative. Her
> speech is tangential and at times disjointed.

R. 550. She denied hallucinations, but her insight and judgment were poor. *Id.*

On January 21, 2005, Plaintiff was evaluated by psychologist William E. Spence,

Jr., Ph.D., to determine her competency to stand trial in a new criminal case. R. 276.

She was facing criminal charges for shoplifting. *Id.* She said she had not taken

medication for a long time and did not need it. *Id.* She had last been seen at the

Apalachee Center on May 16, 2002, for medications. *Id.* Dr. Spence determined that

Plaintiff was paranoid, distractable, and unable to concentrate and remain on task. R.

277. She had little insight and her judgment was impaired. *Id.* She reported that she

had earned about 37 hours of credit at Tallahassee Community College toward a

---

[3] A GAF score of 41-50 indicates: "Severe symptoms ( e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) OR any serious impairment in social, occupational or school functioning ( e.g., no friends, unable to keep a job )." *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

degree in "computers." *Id.* She said she had received social security benefits since 1997. R. 278. Dr. Spence said that with her current level of paranoia and delusional thinking, she would be unpredictable in court. *Id.* He found her incompetent to proceed, with a diagnosis of paranoid schizophrenia, and recommended involuntary commitment for treatment. R. 277-279.

On March 17, 2005, Plaintiff was seen by Marie B. Go, M.D., a staff psychiatrist at the VA hospital for an initial psychiatric evaluation. R. 429. Dr. Go said that Plaintiff had not had consistent "medication intake" since 2000. R. 430. She had just been released from the Leon County Jail. *Id.* Plaintiff said she last used crack cocaine in June, 2004. *Id.* On examination, she was found to be alert, oriented, but anxious and with inappropriate affect at times. *Id.* She found Plaintiff exhibited looseness of associations, was tangential, and was having visual hallucinations. *Id.* Her diagnosis was chronic undifferentiated schizophrenia, cocaine abuse in early remission. *Id.* She assigned a GAF score of 50. R. 431.

On May 25, 2005, an adjudicator looking at Plaintiff's claim for the Social Security office felt that given the "tenuousness of [Plaintiff's] improvement," additional inquiry was needed. R. 79. The adjudicator noted:

> There is evidence in the file which suggests that claimant's functioning is not adequate. The forms completed by her are poorly done, with items completed by her scratched out all over. The 3369 in particular is not representative of an individual who is functioning adequately.

R. 79.

On July 28, 2005, Plaintiff was seen again by Dr. Go.  R. 500.  She had stopped taking Cogentin,[4] but was taking Abilify.[5]  It was noted that Plaintiff lived with her mother, who was her guardian.  *Id.*  She said she was going to school and her grades were not good.  *Id.*  On examination it was found that Plaintiff was alert, somewhat anxious, but her speech was at a normal rate and volume, her affect was congruent, and there were no loose associations or delusions.  *Id.*  She was assigned a GAF of 55.  *Id.*

Plaintiff returned to Dr. Go on November 23, 2005.  R. 821.  She complained of muscle stiffness in her mouth and jaw from taking Abilify, and she had reduced the dosage.  *Id.*  She wanted to take Benadryl for the side effects.  *Id.*  She planned to "got back to school in January."  *Id.*  A GAF of 55 was assigned.  *Id.*

On January 11, 2006, Plaintiff was seen again by Dr. Go.  R. 819.  She found that Plaintiff was experiencing "some paranoia" but knew her fears were not based in reality, and Abilify was helping.  *Id.*  Benadryl was also helping.  *Id.*  A GAF of 65[6] was assigned.  R. 820.

---

[4] Cogentin is used in adjunct therapy for all forms of parkinsonism.  It is also useful in the control of extrapyramidal disorders (except tardive dyskinesia) due to neuroleptic drugs (e.g., phenothiazines).  PHYSICIANS' DESK REFERENCE (2005).

[5] Abilify is indicated for the treatment of schizophrenia.  PHYSICIANS' DESK REFERENCE (2005).

[6] A GAF score of 61-70 indicates: "Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning (e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships."  *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

On April 11, 2006, Dr. Go said that Plaintiff had been more compliant with medications, had not been using drugs or alcohol, and her condition was stable. R. 809. She had been looking for a job through the temporary labor pool. *Id.* Dr. Go said: "Patient is not psychotic now but I believe she can't handle anything more than minimal stress. I don't know if she could function in a work setting without decompensating." *Id.* Her judgment and insight were thought to be intact, and her thought processes were organized. R. 810. A GAF score of 55 was assigned. *Id.*

On July 11, 2006, Plaintiff again saw Dr. Go. R. 859. She had started "online studies" three weeks earlier, and "so far she is reportedly keeping up with the subject matter." *Id.* She was not using drugs or alcohol. *Id.* Her mood was euthymic,[7] her affect was bland, and she suffered no delusions. R. 860. The diagnosis, including chronic undifferentiated schizophrenia, remained the same. *Id.* A GAF of 55 was assigned. *Id.*

On October 25, 2006, Plaintiff was again seen by Dr. Go. R. 850. The diagnosis remained the same. *Id.* Plaintiff reported that Abilify and Benadryl were helping, with no side effects. *Id.* She was still taking online courses. *Id.* A GAF of 65 was assigned. R. 851.

On March 15, 2007, Plaintiff was seen by Dr. Go at the VA hospital. R. 846. She was still living with her mother and was compliant with medications. *Id.* She denied having delusions or hallucinations. *Id.* Her thought processes were organized, and her judgment and insight were intact. *Id.* Dr. Go assigned a GAF of 65. *Id.*

---

[7] "Euthymic is a medical term referring to a joyful or tranquil mood, neither manic nor depressed." Sultan v. Barnhart, 368 F.3d 857, 861 n. 2 (8th Cir. 2004).

On April 25, 2007, Dr. Go completed a questionnaire as to Plaintiff's Mental Residual Functional Capacity. R. 863. She said that Plaintiff was markedly impaired in ability to accept instruction or respond appropriately to criticism from supervisors, to work in coordination or proximity with others without distracting them or exhibiting behavioral extremes, to respond appropriately to co-workers, and to relate to the general public and maintain socially appropriate behavior. R. 863. "Marked" was defined "impairment seriously affects ability to function in a work setting." *Id.* Dr. Go said that her answers to these questions would not change if only minimal contact or interaction with others was required. R. 864. Dr. Go also thought that Plaintiff is markedly impaired in ability to complete work task in a normal work week at a consistent pace, to work with others without being distracted by them, to process subjective information accurately and use appropriate judgment, to carry through instructions and complete tasks independently, to maintain attention and concentration for more than brief periods of time, and to perform at production levels expected by most employers. R. 864. She determined that Plaintiff was markedly impaired in ability to respond appropriately to changes in a work setting, to remember locations and workday procedures, to be aware of normal hazards, to behave predictably, reliably, and in an emotionally stable manner, and to tolerate customary work pressures. R. 864-865. She thought that Plaintiff was only moderately impaired in ability to maintain personal appearance and hygiene. R. 865. She said that Plaintiff's impairments would become worse if Plaintiff were to be placed under stress, and that the impairment that would most likely become worse under stress was the ability to behave predictably and in an emotionally stable manner. *Id.* Dr. Go explained that Plaintiff is "diagnosed with chronic

schizophrenia and can definitely decompensate under [a] stressful environment like a job." *Id.* She said that Plaintiff is capable of managing her own funds. *Id.*

On June 7, 2007, Plaintiff returned to Dr. Go. R. 908. Plaintiff wanted to take Abilify in liquid form, but that form was not available to Dr. Go. *Id.* Dr. Go also told Plaintiff she wanted her to take Abilify in tablet form since her compliance was better. *Id.* Plaintiff said she did not then hear voices, but caught herself talking in her sleep. *Id.* Dr. Go said: "Patient is functioning at her baseline." *Id.* A GAF score of 65 was again assigned. R. 909. Plaintiff was to return on September 6, 2007. *Id.*

Plaintiff was seen by an optometrist on June 26, 2007, concerning her thyroid eye disease. R. 903. The optometrist wrote that Plaintiff "was very difficult to examine due to the [underlying] psychological problems." *Id.*

On April 28, 2008, about six months after the administrative hearing, Plaintiff was seen again by Dr. Go. R. 960. Plaintiff said she "was not in school right now." *Id.* She was working three days a week for a company cleaning houses. *Id.* The other two days a week she worked for her uncle, cleaning houses. *Id.* Plaintiff denied having hallucinations or paranoia, but said that when she was around crowds of people, she became uneasy and disorganized, and her words come out backwards. R. 961. A GAF of 65 was assigned. *Id.*

**Legal analysis**

### Whether the ALJ erred in rejecting the opinion of the treating physician

Dr. Go was Plaintiff's treating psychiatrist. The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good

cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.

1997).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a

"detailed, longitudinal picture" of impairments is the length of the treatment relationship,

the frequency of examination, the extent of the knowledge of the treating source as

shown by the extent of examinations and testing, the evidence and explanation

presented by the treating source to support his or her opinion, the consistency of the

opinion with the record as a whole, and whether the treating source is a specialist with

respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be

supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th

Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's

opinion and any reason for giving it no weight, and failure to do so is reversible error."

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).   "Where the Secretary has

ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter

of law that he has accepted it as true." *Id.* (emphasis added);  Elam v. Railroad

Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL

635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD).  *Compare*, Harris v. Astrue,

546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT) (remanding because the

ALJ gave improper reasons to discount the opinion of a treating physician, but did not ignore it).[8]  *But see,* Cole v. Barnhart, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding that the opinions of the treating physician must be accepted as true where the ALJ "did not properly refute them.").

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The Administrative Law Judge determined that Dr. Go's opinion as to Plaintiff's mental residual functional capacity was not entitled to substantial weight because the opinion was not accompanied by objective evidence.  R. 27.  The medical records reflect that Plaintiff has been treated for schizophrenia since 1986, for more than 20 years.  She has been involuntarily committed for treatment several times, was awarded benefits in the late 1990's,[9] and was found incompetent to stand trial in 2005.  This

---

[8] Harris distinguished MacGregor as a case where the ALJ made no finding as to the weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion. 786 F.Supp.2d at 1282.

[9] According to one notation in the record, Plaintiff has been awarded social security benefits "multiple times in the past," but the benefits terminated because she went to jail or prison.  R. 79.  However, another note indicates that she had been denied benefits

reason for discounting the opinion of Dr. Go is not supported by substantial evidence in the record.

The ALJ next said that he did not accept Dr. Go's opinion because the opinion was inconsistent with the "VA progress notes." R. 27. The ALJ did not mention the medical notes from the Apalachee Center for Human Services. On February 7, 2000, Plaintiff was seen at the Apalachee Center. R. 550. She was again noncompliant with medication, and had not been seen since July 26, 1999, and Dr. Escueta said that she was "not sure if this client can focus in her school work. She is hyperverbal and argumentative. Her speech is tangential and at times disjointed." *Id.*

On January 21, 2005, Dr. Spence, the psychologist, determined that Plaintiff was paranoid, distractable, and unable to concentrate and remain on task. R. 277. She had little insight and her judgment was impaired. *Id.* She had reported that she had earned about 37 hours of credit at Tallahassee Community College toward a degree in "computers," R. 278, but that is unlikely as Plaintiff said at her hearing in 2007 that she was still at Tallahassee Community College taking math and reading. Dr. Spence said that with her current level of paranoia and delusional thinking, she would be unpredictable in court. *Id.* He found her incompetent to proceed, with a diagnosis of paranoid schizophrenia, and recommended involuntary commitment for treatment. R. 277-279.

Plaintiff started treatment with Dr. Go on March 17, 2005. R. 429. At the initial examination, Dr. Go found Plaintiff had looseness of associations, was tangential, and

on multiple times, but had been awarded benefits in 1997, and that benefits should have ceased in 1998, but did not cease until May, 2000, when she was incarcerated. R. 175.

had visual hallucinations, and assigned a GAF score of 50. R. 431. On July, 28, 2005, Dr. Go assigned a GAF of 55. R. 500. On November 23, 2005, she assigned a GAF score of 55. R. 821. On January 11, 2006, she assigned a GAF score of 65. R. 820. On April 11, 2006, although Plaintiff had been more compliant with medications, had not been using drugs or alcohol, and had been looking for a job through the temporary labor pool, Dr. Go said: "Patient is not psychotic now but I believe she can't handle anything more than minimal stress. I don't know if she could function in a work setting without decompensating." R. 809. A GAF score of 55 was assigned. *Id.* On October 25, 2006, Dr. Go found that Abilify and Benadryl were helping, and a GAF of 65 was assigned. R. 851. A GAF score of 65 was noted by Dr. Go again on March 15, 2007. R. 846. Plaintiff was seen again by Dr. Go on June 7, 2007, and a GAF score of 65 was noted, which Dr. Go said was her "baseline" of functioning. R. 908-909. Thus, by the time that Dr. Go completed the mental residual functional capacity questionnaire, she had seen Plaintiff seven times over a two year period. She had assigned GAF scores of 50, 55, and more recently, 65, but she had noted that she did not think Plaintiff could function in a work setting without breaking down. Further, on June 26, 2007, the optometrist on June 26, 2007, found that Plaintiff "was very difficult to examine due to the [underlying] psychological problems." R. 903.

Therefore, Dr. Go's opinion was not "inconsistent" with the VA notes. A baseline GAF score of 65 simply indicates that Plaintiff was stable at that functional level, but she was not then subjected to the stresses of a job. She was unemployed. Dr. Go had a lengthy treatment relationship with Plaintiff, and her notes are not inconsistent with her

opinion that Plaintiff would decompensate if subjected to the stresses of work. This was not a reason supported by substantial evidence to disbelieve Dr. Go.

The third reason given by the ALJ for discounting Dr. Go's opinion was that Dr. Go's opinion was inconsistent with the Plaintiff's own description of her activities of daily living. R. 27. While Plaintiff inconsistently testified that she spent two days a week in school, she also testified that she walked all day or she rode the bus. Walking around the community all day is not an activity of daily living inconsistent with Dr. Go's opinion. Plaintiff testified that she tried to work in temporary jobs, but this only amounted to work about once a month. Plaintiff said she was in school, but she had been going to community college for many years, since 1999, and there is no evidence that she has ever completed a course and been awarded credit. By April, 2008, she was no longer trying to go to school. It is highly doubtful that Plaintiff has been able to accomplish much at school if she was walking eight hours a day. None of this is substantial evidence of activities of daily living to discount the opinion of Dr. Go.[10]

The fourth reason given by the ALJ for discounting Dr. Go's opinion was that it was in a "check-block format." R. 27. The opinion of a treating physician, as well as State agency physicians who never see the claimant and express an opinion based solely upon the medical records, are almost always on a "check-block format." This is not a good reason to reject Dr. Go's opinion.

---

[10] Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work).

The fifth reason to discount Dr. Go's opinion was that she assigned GAF scores of 65. R. 27. In the abstract, a GAF score of 65 would be substantial evidence to believe that Plaintiff has enough mental residual functional capacity to do work. But this was the baseline when Plaintiff was compliant with her medications, about as good as Plaintiff might be expected to do without undergoing the stress of work. Plaintiff was not at that time challenged by anything approaching the stresses of a steady job. Plaintiff worked a temporary job about once a month. She said she was in school, but she actually walked 8 hours a day. In context, the several GAF scores of 65 was not substantial evidence to disbelieve Dr. Go.

The sixth reason given to discount Dr. Go's opinion was that Plaintiff's testimony during the hearing was coherent, clear, and goal directed, and she was able to concentrate and respond appropriately. R. 27. The ALJ noted no signs of adverse effects of medication. *Id.* A lay person such an Administrative Law Judge is competent to judge whether a person is responsive, maintains focus, and apparently comprehends during a hearing, but the medical evidentiary value of these short observations, by a person without medical training, is slight. In the Eleventh Circuit, it is not appropriate for the Administrative Law Judge, who is not a medical expert, subjectively to arrive at an index of traits which he expects the claimant to manifest at the hearing, and then to deny the claim when such traits are not observed. Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).[11] Even if it were appropriate to reject a treating physician's

---

[11] The Eleventh Circuit has termed this "sit and squirm jurisprudence," and forbids that this method of analysis be used. McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988); Johns v. Bowen, 821 F.2d 551, 557 (11th Cir. 1987); Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984). It is proper, however, for the ALJ to consider the

opinion based upon the ALJ's psychiatric observations, Plaintiff's testimony about whether or not she pays rent to her mother, or whether she attends school or walks all day, was not particularly coherent.

In summary, the ALJ's reasons for failing to give substantial weight to the opinion of Dr. Go are not supported by substantial evidence in the record. This ordinarily would result in a finding that Dr. Go's opinion now must be accepted as true and an order that Plaintiff's application for benefits be granted.

That is not recommended here, however, as there is a troubling bit of evidence that came into the record after the ALJ's decision, rendered on January 25, 2008. R. 29. On April 28, 2008, Plaintiff was no longer in school, and a GAF of 65 was again assigned by Dr. Go. R. 960. Dr. Go reported that Plaintiff said that she became uneasy and disorganized around crowds. *Id.* However, Plaintiff apparently told Dr. Go that she was then working full time, five days a week, doing house cleaning, and she was no longer trying to go to school. R. 960.

It is unknown whether Plaintiff continued to work in this fashion. This might have been the beginning of lasting recovery for Plaintiff, although two of the days of work were with her uncle, and may have been more in the nature of sheltered work. This also might have been just another episode of temporary work, like the labor force work.

———————————————

claimant's demeanor and appearance during the hearing as long as this is not in lieu of consideration of the medical evidence presented. Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985); Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987). "We do not accept an ALJ's mere reliance on his observation of a claimant during a hearing as the only basis upon which to reject a claimant's reference to pain." Norris, 760 F.2d at 1158.

It is recommended that the case be remanded to gather additional evidence about whether Plaintiff has continued to work. If she has, Dr. Go should be asked to reconsider her April, 2007, opinion in light of Plaintiff's actual work history, and depending on what Dr. Go says, it may then be appropriate to deny Plaintiff's application for benefits. If Plaintiff has not persistently worked a full week, and if she has not continued to work, then the Commissioner should accept Dr. Go's April, 2007, opinion as true and award supplemental security income benefits to Plaintiff. Remand will also provide an opportunity to update Plaintiff's mental health treatment records.

**Whether the ALJ erred in the evaluation of Plaintiff's credibility**

The ALJ determined that Plaintiff's testimony was not credible because it contained inconsistencies. R. 26. It does little good for the ALJ or this court to try to assess the extent of Plaintiff's mental impairment by parsing her testimony. A person impaired by schizophrenia will probably manifests testimonial inconsistencies. That is why Dr. Spence found her incompetent to stand trial in 2005. The dispositive issue is whether the opinion of Plaintiff's treating psychiatrist should have been given substantial weight. That question cannot be finally known until new evidence is obtained to clarify Plaintiff's working status.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly followed the law and were not based upon substantial evidence in the record. The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and the case be remanded to gather additional evidence about whether Plaintiff has continued to work and to update her mental health treatment

records. If Plaintiff has continued to work an five day week as a house cleaner, Dr. Go should be asked to reconsider her April, 2007, opinion in light of Plaintiff's actual work history, and depending on what Dr. Go says, it may then be appropriate to deny Plaintiff's application for benefits. If Plaintiff has not persistently worked a full week, and if she has not continued to work, then the Commissioner should accept Dr. Go's April, 2007, opinion as true and award supplemental security income benefits to Plaintiff..

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and **REMANDED** for the purposes set forth above.

**IN CHAMBERS** at Tallahassee, Florida, on September 21, 2009.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**